No. 08-4305

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE THIRD CIRCUIT

JOHN E. du PONT,

APPELLANT,

v.

PAUL STOWITZKY, Superintendent of SRCF
Mercer; District Attorney of Delaware County,
Pennsylvania; and Attorney General of the
Commonwealth of Pennsylvania,

APPELLEES.

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

**On Appeal from Sept. 17, 2008 Final Order by
Eastern District of Pennsylvania (No. 06-00147)**

Burt M. Rublin (Pa. I.D. No. 32444)
rublin@ballardspahr.com
Diana L. Spagnuolo (Pa. I.D. 92227)
spagnuolod@ballardspahr.com
BALLARD SPAHR ANDREWS &
INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 665-8500

David Rudovsky (Pa. I.D. No. 15168)
drudovsky@krlawphila.com
KAIRYS, RUDOVSKY,
MESSING & FEINBERG, LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

Table of Authorities ................................................................. iii

I.    INTRODUCTION ............................................................ 1

II.   HISTORY OF THE CASE ............................................... 6

    A.    The Facts ........................................................... 6

    B.    The Trial ........................................................... 8

III.  LEGAL STANDARD ...................................................... 9

IV.   ARGUMENT .................................................................. 9

    A.    As Applied in this Case, Pennsylvania's System for
    Determining Whether a Defendant is "Not Guilty by Reason of
    Insanity" or "Guilty but Mentally Ill" Violated du Pont's Right
    to Due Process of Law by Permitting a Conviction Based on
    His Prior Bad Acts and a Determination that He Was a "Bad"
    Man ................................................................................. 9

        1.    The Due Process Violation ....................................... 10

            a.    Pennsylvania's Unique Statutory Scheme ..................... 10

            b.    Bad Acts Evidence ......................................... 13

        2.    The Magistrate Judge's Decision ............................. 16

    B.    Claims of Ineffective Assistance of Counsel ...................... 24

        1.    Counsel Were Ineffective in Failing to Present Good
            Character Evidence ................................................. 24

2.     Counsel Were Ineffective in Not Requesting Limiting
Instructions Regarding Evidence of du Pont's Pre-Arrest
Silence and Requests to Consult with Counsel.......................... 26

3.     Counsel Were Ineffective for Not Properly Investigating
du Pont's Use of a Dangerous Prescription Drug as
Necessary Rebuttal to the Commonwealth's Argument
that Cocaine Caused du Pont's Mental Illness.......................... 28

4.     The State Courts Violated du Pont's Right to Counsel by
Permitting the Psychiatrist/Lawyer Dr. O'Brien to Testify
as an Expert Witness ................................................................ 31

C.     du Pont Was Deprived of Due Process of Law and His Right to
Confrontation as a Result of the Commonwealth's Presentation
of False Evidence and the Suppression of Exculpatory Evidence ..... 34

D.     The Magistrate Judge Ignored Controlling Law on the Standard
for Prejudice ................................................................................. 36

V.     CONCLUSION............................................................................ 39

# TABLE OF AUTHORITIES

## FEDERAL CASES

Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007) ............................................ 4

Albrecht v. Horn, 485 F.3d 103 (3d Cir. 2007) .................................. 15, 19-20

Brinegar v. U.S., 338 U.S. 160 (1949) ............................................................. 14

Castleberry v. Brigano, 349 F.3d 286 (6th Cir. 2003) ................................... 37

Clark v. Arizona, 548 U.S. 735 (2006) ........................................................... 11

Combs v. Coyle, 205 F.3d 269 (6th Cir. 2000) ............................................... 26

Coppola v. Powell, 878 F.2d 1562 (1st Cir. 1989) ......................................... 26

Dugas v. Coplan, 428 F.3d 317 (1st Cir. 2005) ....................................... 31, 38

Estelle v. McGuire, 502 U.S. 62 (1991) .......................................................... 22

Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005) .............................................. 4, 31

Marshall v. Hendricks, 307 F.3d 36 (3d Cir. 2002) ........................................ 5

McKinney v. Rees, 993 F.2d 1378 (9th Cir. 1993) ........................................ 15

Miller-El v. Cockrell, 537 U.S. 322 (2003) .................................................. 2, 9

Old Chief v. U.S., 519 U.S. 172 (1997) ........................................................... 14

Ouska v. Cahill-Masching, 246 F.3d 1036 (7th Cir. 2001) ........................... 26

Patterson v. New York, 432 U.S. 197 (1977) .................................................... 9

Taylor v. Maddox, 366 F.3d 992 (9th Cir. 2004) .......................................... 33

U.S. v. Blasco, 702 F.2d 1315 (11th Cir. 1983) ............................................ 32

U.S. v. Burson, 952 F.2d 1196 (10th Cir. 1991) ............................................ 26

U.S. v. Morena, --- F.3d ----, 2008 WL 4925051 (3d Cir. Nov. 19, 2008) ........................................................................................... 15, 22, 23

U.S. v. Sampson, 980 F.2d 883 (3d Cir. 1992) ...................................... 15, 22

U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150 (1940)................................... 4

Virgin Islands v. Toto, 529 F.2d 278 (3d Cir. 1976) ................................... 22

Wainwright v. Greenfield, 474 U.S. 284 (1986) .......................................... 26

Weatherford v. Bursey, 429 U.S. 545 (1977)............................................... 32

Wiggins v. Smith, 539 U.S. 510 (2003) ................................................... 5, 31

Williams v. Taylor, 529 U.S. 362 (2000) ....................................................... 5

## STATE CASES

Colorado v. Welsh, 58 P.3d 1065 (Colo. Ct. App. 2002)............................... 26

Comm. v. Belmonte, 502 A.2d 1241 (Pa. Super. Ct. 1985)......................... 11

Comm. v. du Pont, 730 A.2d 970 (Pa. Super. Ct. 1999) ............. 10-11, 17, 32

Comm. v. du Pont, 860 A.2d 525 (Pa. Super. Ct. 2004) ........................ 25, 27

Comm. v. Morgan, 739 A.2d 1033 (Pa. 1999) ............................................. 24

Comm. v. Neely, 539 A.2d 1317 (Pa. Super. Ct. 1988)............................... 11

Comm. v. Rabold, 951 A.2d 329 (Pa. 2008) ................................................ 17

Comm. v. Scott, 436 A.2d 607 (Pa. 1981)................................................... 24

Comm. v. Trill, 543 A.2d 1106 (Pa. Super. Ct. 1988) ................................ 17

Comm. v. Williams, 160 A. 602 (Pa. 1932)................................................. 19

Comm. v. Zook, 887 A.2d 1218 (Pa. 2005) ................................................... 31

## FEDERAL STATUTES

28 U.S.C. § 2253 ................................................................................................ 9

28 U.S.C. § 2254 ........................................................................................... 4, 33

## STATE STATUTES

18 Pa. C.S.A. § 314 ....................................................................................... 2, 10

18 Pa. C.S.A. § 315 ....................................................................................... 2, 11

## OTHER

Bradford H. Charles, Pennsylvania's Definitions of Insanity and
Mental Illness: A Distinction with a Difference?, 12 TEMP. POL. &
CIV. RTS. L. REV. 265 (2003) .......................................................................... 12

GOODMAN AND GILMAN: THE PHARMACOLOGICAL BASIS OF
THERAPEUTICS 150 (9th ed., 1996) ........................................................ 28, 30

PAUL HOLMES, THE SHEPPARD MURDER CASE (1961) ................................. 37

Pa. Legislative Journal, House, 2131-32 (Nov. 29, 1982) .......................... 12

Pa. Rules of Professional Conduct, Rule 1.14, cmt ...................................... 33

Pa. Standard Jury Instruction 5.01A(1) ....................................................... 13

## I.    INTRODUCTION

On April 18, 2007, Magistrate Judge Linda K. Caracappa issued a Report

and Recommendation ("RR") recommending that John E. du Pont's petition for

writ of habeas corpus be denied and that a certificate of appealability ("COA") not

be granted. (A copy of the RR is attached hereto as Exhibit A.)[1]  Nearly 1-½ years

later, on September 17, 2008, the District Court summarily affirmed the RR

without any accompanying opinion. (A copy of the District Court's Order is

attached hereto as Exhibit B.)  Despite du Pont's request for an evidentiary hearing

in connection with his claims of ineffective assistance of counsel discussed below,

neither the Magistrate Judge nor the District Court held a hearing before rendering

their decisions.  Previously, du Pont was denied a hearing by the Pennsylvania trial

court when it rejected his petition under the Post-Conviction Relief Act ("PCRA").

This Application may well represent du Pont's last opportunity to be heard,

and he respectfully submits that he has raised serious and substantial constitutional

claims that are well deserving of this Court's further consideration.  du Pont's

habeas petition should not have been given such short shrift by the Magistrate

Judge and District Court, as he has raised significant constitutional issues that

plainly meet the requisite standard of "deserv[ing] encouragement to proceed

---

[1]    All exhibits attached hereto are part of the District Court record and are
reproduced here for this Court's convenience.

further." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 323 (2003).  Indeed, du Pont's due

process challenge to Pennsylvania's unique Guilty, but Mentally Ill ("GBMI")

statute (18 Pa. C.S.A. §§ 314(c)(1), 315) and the standard jury instructions used at

his trial raises significant constitutional issues that have never before been

addressed by this Court.

Nearly 13 years ago, du Pont shot and killed David Schultz.  There was no

rational explanation for this unprovoked shooting.  The sole issue to be resolved by

the jury was whether du Pont was legally insane, which turned on whether he knew

what he did was wrong.  18 Pa. C.S.A. § 315.  However, in violation of du Pont's

due process rights, the jury was specifically instructed to decide whether du Pont

was **"sick rather than bad"** at the time of the shooting (and thus not guilty by

reason of insanity), or **"both bad and sick"** (and thus guilty but mentally ill).

(N.T. 3138-39.)  (All portions of the trial transcript cited herein are attached hereto

as Exhibit C.)  Since the Commonwealth and its experts had conceded at trial that

du Pont was mentally ill (<u>i.e.</u>, "sick"),[2] the jury's determination of guilt or

innocence by reason of insanity was necessarily based on its view of whether du

Pont was a "bad" man.  (<u>Id.</u>)  After seven days of deliberations, it found du Pont

---

[2]     <u>See</u> Testimony of Dr. John S. O'Brien, II (N.T. 2412, 2288, 2296, 2351);
Testimony of Dr. Park Elliott Dietz (N.T. 2721, 2723).  The Commonwealth
also conceded at closing argument that du Pont was mentally ill.  (N.T.
3065.)

2

guilty but mentally ill of third degree murder, and he was sentenced to a term of 13 to 30 years.

Not only did the prosecution introduce a vast array of irrelevant and highly prejudicial "bad acts" evidence,[3] it further inflamed the passions of the jury by repeatedly emphasizing du Pont's great wealth throughout the trial, from the opening statement to the closing argument. Indeed, in closing argument, the prosecutor described du Pont as "a person on whom responsibility is not a big part of his character, who never wants to own up to anything, who believes he owns people, who thinks his wealth and power and influence of police can let him get away with anything." (N.T. 3094-95.) By the end of the trial, du Pont had been thoroughly vilified and caricatured as a wealthy, arrogant, powerful and very "bad" man.

While du Pont's wealth does not provide him with any greater rights under the law, it should not be used as a weapon against him, either. The

---

[3]    This "bad acts" evidence included allegations that du Pont used cocaine (N.T. 1821-25; 1829-33; 1990-91; 2288; 2407-9; 2437); fired black wrestlers from his Team Foxcatcher wrestling team without justification (N.T. 2750-52; 852); was involved in a hit-and-run more than eight years before the shooting (N.T. 2066-67; 2633-34); showed disrespect for the U.S. flag (N.T. 1957); fixed wrestling matches in which he participated (N.T. 1946-47); threw firecrackers at animals (N.T. 1283); claimed to have authored books written by others (N.T. 2264); and drove "at great speeds" around Schultz's children (N.T. 2637-38).

Commonwealth's poisoning of the well with repeated references to du Pont's "wealth," "power" and "vast mansion" was manifestly inappropriate. See, e.g., U.S. v. Socony-Vacuum Oil Co., 310 U.S. 150, 239 (1940) ("appeals to class prejudice are highly improper, and cannot be condoned, and trial courts should ever be alert to prevent them.").

The RR issued by the Magistrate Judge essentially rubber-stamped the fundamentally flawed decisions by the Pennsylvania trial court and Superior Court, and did not engage in any independent analysis of du Pont's federal constitutional claims. This total deference to the state courts is plainly improper under AEDPA. Under 28 U.S.C. § 2254(d)(1), the test is not whether the facts are identical to any previous case, but whether the state court unreasonably failed to apply the clearly established constitutional principles to the particular facts of the case. See, e.g., Abdul-Kabir v. Quarterman, 550 U.S. 233 (2007); Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005).

The specific errors of the Magistrate Judge are addressed below. Initially, however, it is important to note the lower court's repeated findings of no prejudice, even where trial counsel was ineffective in representation, are without foundation. On the prejudice issue, the conclusion by the Magistrate Judge that the Commonwealth's case at trial was "overwhelming," RR at 10, is inexplicable. The case could not have been more closely contested on the issue of insanity. The

4

defense presented several eminent psychiatrists who opined that du Pont suffered from paranoid schizophrenia and that he did not know that his shooting of Schultz was wrong. <u>The jury deliberated for seven days, the longest deliberation in Delaware County history,</u> and rejected the prosecution's first degree murder theory. Thus, this was a very close case indeed, and the constitutionally deficient jury instructions and introduction of the extensive "bad acts" evidence, coupled with repeated pejorative references to du Pont's wealth, tipped the balance.

The Magistrate Judge further erred by ignoring clearly established law that requires a habeas court to assess the cumulative prejudice from each of the violations in assessing the Sixth Amendment claim. <u>See, e.g.</u>, <u>Wiggins v. Smith</u>, 539 U.S. 510, 534-36 (2003) (totality of errors must be considered to properly determine prejudice); <u>Williams v. Taylor</u>, 529 U.S. 362, 396-98 (2000) (acts or omissions must be considered in the aggregate); <u>Marshall v. Hendricks</u>, 307 F.3d 36, 94 (3d Cir. 2002).

Accordingly, for the reasons set forth more fully below, du Pont respectfully submits that this Court should issue a COA so he can proceed further with this habeas appeal.

## II.    HISTORY OF THE CASE

### A.    The Facts

du Pont was a charitable, non-violent and law-abiding individual until the shooting. He devoted a portion of his property, known as Foxcatcher Farm, to the establishment of a wrestling training facility (N.T. 821) and founded a world class wrestling team, Team Foxcatcher (N.T. 1933-36). du Pont provided training facilities for these athletes and, for many of them, including Schultz, he also provided stipends and housing. (N.T. 1998, 2007.)

For years, the people surrounding du Pont witnessed increasingly bizarre behavior. du Pont was plagued by delusions and believed that his wealth put him at grave risk of harm. (N.T. 1866-67.) Legitimate security concerns evolved into irrational fears, which gave way to paranoia. In 1993, he hired Aegis Security to provide security on the farm. (N.T. 228.) Patrick Goodale, an Aegis security consultant, told du Pont that he was vulnerable to criminal activity, including terrorist attacks and kidnapping. (N.T. 238, 342-44.)

du Pont was a frequent visitor to Bulgaria by virtue of his involvement in international wrestling and as a representative of FILA, the international governing body for wrestling within the International Olympic Commonwealth. While in Bulgaria in December 1995, du Pont was examined and treated for a stomach ailment and bronchitis by a Bulgarian physician, Matyo Dimitrou Geshev, M.D.

6

(See Sworn Statement of Dr. Geshev at 12:6-13:9, 8:3-22, a copy of which is attached hereto as Exhibit D.) Dr. Geshev gave du Pont a medication, in tablet form, which contained N-butyl scopolamine.

Sometime during the week immediately preceding the shooting, du Pont was seen at his home in Newtown Square by a second Bulgarian physician, Dr. Luben Krastev Angelov, who had been visiting Foxcatcher Farm along with the Bulgarian wrestling team. Dr. Geshev and Dr. Angelov were both affiliated with that team. Dr. Angelov treated du Pont for continuing stomach ailments. (See Sworn Statement of Dr. Luben Krastev Angelov at 12:16-13:16, 17:4-18:8, a copy of which is attached hereto as Exhibit E.) He instructed du Pont to continue to take the medications prescribed by Dr. Geshev, but to double the dosage to relieve the pain that had persisted. (Id. at 18:21-23:6.)

Upon his return from Bulgaria, du Pont's symptoms and level of extreme paranoia escalated. Following a blizzard in January 1996, du Pont instructed his employees that a road on the farm not be plowed so he could see the footprints of anyone trying to get him. (N.T. 777.) The afternoon before the shooting, du Pont remarked to one of the wrestlers that his life was in jeopardy. (N.T. 1663.)

On the afternoon of January 26, 1996, du Pont went to survey storm damage with Goodale. (N.T. 284.) du Pont took his gun, a camera, and a bird book. (N.T. 284, 1400, 2830.) du Pont drove around the farm and then headed to Schultz's

7

house. After entering the driveway, du Pont drove over to Schultz and, without any cause or provocation, shot him three times. According to Goodale, but no other witness, du Pont asked, "you got a problem with me?" (N.T. 289.) du Pont backed the car out and returned to his home, where he remained surrounded by police for the next two days before surrendering.

### B.    The Trial

The sole question to be resolved at trial was whether du Pont was legally insane when he killed Schultz, and thus not guilty of the killing by reason of insanity. There was no dispute as to du Pont's mental illness; accordingly, the sole issue was whether du Pont knew that killing Schultz was wrong at the time that he shot him. The jury's verdict should have turned on whether du Pont shot Schultz out of a paranoid fear of imminent harm and therefore did not know the killing was wrong, as the defense asserted, or whether he shot him out of anger, as the Commonwealth theorized. Instead, as a result of wholly irrelevant "bad acts" evidence that the Commonwealth was permitted to introduce, and jury instructions that distinguished between guilt and innocence based on whether or not du Pont was "bad," the verdict turned on the jury's resolution of whether or not du Pont was a "bad" man.

The jury returned a verdict of guilty but mentally ill of third degree murder of Schultz and guilty but mentally ill of simple assault of Goodale. On May 13,

8

1997, du Pont was sentenced to a term of 13 to 30 years on the murder conviction and a concurrent term of three to six months on the assault charge.

## III.  LEGAL STANDARD

The Supreme Court has held that "a prisoner seeking a COA need only demonstrate 'a substantial showing of the denial of a constitutional right.' 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 537 U.S. at 327.

## IV.  ARGUMENT

**A.  As Applied in this Case, Pennsylvania's System for Determining Whether a Defendant is "Not Guilty by Reason of Insanity" or "Guilty but Mentally Ill" Violated du Pont's Right to Due Process of Law by Permitting a Conviction Based on His Prior Bad Acts and a Determination that He Was a "Bad" Man**

du Pont was convicted of third degree murder in violation of a "principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Patterson v. New York, 432 U.S. 197, 202 (1977) (holding that a person may be convicted only for what he has done, and not for who he is.) At trial, there was never any dispute that du Pont shot and killed Schultz, or that he was mentally ill when he did so. The only question was whether he was legally insane at the time. But a trial on this limited issue was not to be. Instead, as a

result of a unique and constitutionally flawed statutory scheme that offered no meaningful difference between the alternative verdicts of "not guilty by reason of insanity" and "guilty but mentally ill," a judicially-approved jury instruction which reduced the issue to whether du Pont was "sick rather than bad" (legally insane) or "both bad and sick" (guilty but mentally ill), and the admission of highly inflammatory and irrelevant bad acts evidence to support the latter, du Pont was convicted because the jury concluded he was a "bad" man.

### 1. The Due Process Violation

#### a. *Pennsylvania's Unique Statutory Scheme*

Like a number of states, Pennsylvania created by statute the verdict of "guilty but mentally ill" ("GBMI") to be considered by the jury in conjunction with the verdict of "not guilty by reason of insanity" ("NGRI"). Unlike other states, however, there is no meaningful difference between Pennsylvania's standards for what it means to be "legally insane" and "guilty but mentally ill."

Pennsylvania's GBMI statute provides:

> 'Mentally ill.' One who as a result of mental disease or defect, <u>lacks substantial capacity either to appreciate the wrongfulness of his conduct</u> or to conform his conduct to the requirements of the law.

18 Pa. C.S.A. § 314(c)(1) (emphasis added).

Inexplicably, this definition of **"mentally ill"** is identical to the American Law Institute's definition of **insanity** adopted by numerous other states. <u>See</u>

10

<u>Comm. v. du Pont</u>, 730 A.2d 970, 979 (Pa. Super. Ct. 1999) ("the Model Penal

Code definition of 'insanity'. . .is the same as Pennsylvania's 'guilty but mentally

ill' definition").

Pennsylvania then employs the M'Naghten test for its definition of legal

insanity, which provides that a person is not guilty by reason of insanity if:

> [A]t the time of the commission of the offense, the actor was laboring under such a defect of reason, from disease of the mind, as not to know the nature and quality of the act he was doing or, if the actor did know the quality of the act, <u>that he did not know that what he was doing was wrong</u>.

18 Pa. C.S.A. § 315 (emphasis added).

In the hands of a lay jury, then, the difference between guilt and innocence

hangs on the ephemeral distinction between "appreciating" that one's act was

wrong and "knowing" it was wrong.[4] **No other state employs such a scheme --**

relying on the ALI test of insanity, itself an <u>exculpatory</u> test, for its <u>inculpatory</u>

GBMI verdict, and relying on the alternative but mutually inclusive M'Naghten

test as its test for legal insanity.

---

[4]    In fact, even Pennsylvania courts have used the terms "appreciate" and "know" interchangeably in insanity cases. <u>See, e.g.,</u> Comm. v. Belmonte, 502 A.2d 1241, 1245 (Pa. Super. Ct. 1985), <u>overruled on other grounds by</u> <u>Comm. v. Neely</u>, 539 A.2d 1317 (Pa. Super. Ct. 1988) (accused "is legally insane only if ... he either did not appreciate the nature and quality of his act or did not know that it was wrong"). So too has the Supreme Court. <u>See</u> <u>Clark v. Arizona</u>, 548 U.S. 735, 758-59 (2006).

11

Indeed, when the GBMI bill was debated in the Pennsylvania Legislature,

Representative Stephen E. Levin stated:

> [T]he definition of "insanity" and the definition of "guilty but
> mentally ill" are in the fact the same. . . [U]nder the two
> definitions, could anyone who is found not guilty by reason of
> insanity under the M'Naghten defense not also fit under the
> "guilty but mentally ill" definition?. . . [T]he point is very
> simple.  Anyone who is found not guilty because of insanity fits
> under the other definition.

Pa. Legislative Journal, House, 2131-32 (Nov. 29, 1982).

Judge Bradford H. Charles of the Lebanon County Court of Common Pleas

has observed:

> Both judges and juries face a Herculean task in distinguishing
> the difference between the legal definitions of insanity and
> mental illness. . .  Any criminal trial judge who has attempted to
> explain the legal definitions of insanity and mental illness can
> relate the quizzical looks given by juries when the legal
> definitions are read to them.

Bradford H. Charles, Pennsylvania's Definitions of Insanity and Mental Illness: A

Distinction with a Difference?, 12 TEMP. POL. & CIV. RTS. L. REV. 265, 271-72

(2003).  Judge Charles (who was formerly District Attorney of Lebanon County

and "prosecuted numerous cases where the insanity defense was raised," id. at 272

n. 1) expressed the view that "[i]n Pennsylvania, the distinction between the

definition of mental illness and insanity is merely semantic," and consequently

juries "are left to make 'ends-oriented' decisions." Id. at 265, 272 (emphasis

added).

The due process problems created by the statute are then exacerbated by
Pennsylvania's Standard Jury Instruction (5.01A(1)), which requires the jury to
determine whether the defendant was "sick rather than bad" at the time he
committed the act at issue ("not guilty by reason of insanity") or "both bad and
sick" ("guilty but mentally ill").  The jury in this case was instructed:

> The verdict of not guilty by reason of legal insanity labels a
> defendant as sick rather than bad.  It signifies that in the eyes of
> the law the person because of mental abnormality at the time of
> the crime does not deserve to be blamed and treated as a
> criminal for what he did.
>
> The verdict of guilty but mentally ill labels a defendant as both
> bad and sick.  It means that in the law's eyes that person at the
> time of the crime was not so mentally abnormal as to be
> relieved from blame and criminal punishment, but that he was
> abnormal enough to make him a likely candidate for special
> therapeutic treatment.

(N.T. 3138-39) (emphasis added).

Rather than aid the jury in the difficult task of assessing du Pont's mental
condition in relation to his conduct, the jury was instructed instead to focus on
whether or not he was a "bad" man.

### b.    *Bad Acts Evidence*

The jury's determination of whether du Pont was "bad" was necessarily
influenced by the Commonwealth's systemic assault on his character and relentless
portrayal of him as a "bad" man.  It accomplished this through the introduction of a
vast array of highly prejudicial bad acts evidence that had nothing whatever to do

13

with the issue of whether he knew that shooting Schultz was wrong. The jury

heard, <u>inter alia</u>, that du Pont: allegedly abused cocaine (N.T. 1821-25; 1829-33);[5]

tried to fire "several very talented African American athletes" from the team

without explanation (N.T. 2750-52; N.T. 852); was involved in a hit-and-run

accident more than <u>eight years</u> before the shooting (N.T. 2066-67, 2633-34);

disrespected the U.S. flag (N.T. 1957); fixed wrestling matches (N.T. 1946-47);

threw firecrackers at animals (N.T. 1283); and was found by a doctor to be

"cunning, conniving and manipulative." (N.T. 1847-48.)

     It is well-established that a defendant may not be convicted of a crime based

on evidence of his "bad character." <u>See</u> <u>Old Chief v. U.S.</u>, 519 U.S. 172, 181

(1997) ("Courts … disallow resort by the prosecution to any kind of evidence of a

defendant's evil character to establish a probability of his guilt"). This rule is

grounded in the Constitutional guarantee of due process, which protects the

fundamental right to a fair trial in criminal cases. <u>See</u> <u>Brinegar v. U.S.</u>, 338 U.S.

160, 174 (1949) (rules of evidence essential to a fair trial are constitutionally

mandated). This Court has just reaffirmed the need to safeguard against such due

process violations:

---

[5]    The single instance of direct evidence on that subject came from a witness,
Robert Calabrese, who, as discussed <u>infra</u>, has since recanted that testimony.

> Admission of bad acts evidence must be carefully scrutinized because, "[a]lthough the government will hardly admit it, the reasons proffered to admit prior-bad-act evidence may often be a Potemkin, because the motive, we suspect, is often mixed between an urge to show some other consequential fact as well as to impugn the defendant's character."

U.S. v. Morena, --- F.3d ----, 2008 WL 4925051 at *2 (3d Cir. Nov. 19, 2008)

(citing U.S. v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992)).

Accordingly, the admission of evidence of a defendant's bad acts for no purpose other than to show criminal propensity violates due process. See, e.g., McKinney v. Rees, 993 F.2d 1378, 1384-86 (9th Cir. 1993) (granting habeas relief and emphasizing "people are convicted because of what they have done, not who they are"). Indeed, as this Court has recognized in the habeas context, due process may be violated even when bad acts evidence is admitted for a legitimate purpose if "the probative value of the evidence, although relevant, was greatly outweighed by the prejudice to the accused." Albrecht v. Horn, 485 F.3d 103, 122 (3d Cir. 2007).

In this case, the introduction of wholly irrelevant "bad acts" evidence would have been unconstitutionally prejudicial in any event. Here, its prejudicial impact was greatly increased by the fact that, as a result of Pennsylvania's statutory scheme and the jury instruction quoted above, guilt or innocence by reason of insanity turned entirely on whether or not the jury found du Pont to be a "bad"

15

man. (N.T. 3138.)  Due process simply cannot abide a determination of guilt

rendered in such flagrant violation of its principles.

>    2.    The Magistrate Judge's Decision

The Magistrate Judge's decision erroneously divides du Pont's claim into

two:  that Pennsylvania's statutory framework for determining whether a defendant

is "not guilty by reason of insanity" or "guilty but mentally ill" violated his due

process rights (claim 7 in the RR at 3); and that the admission of bad acts evidence

violated his due process rights (claim 8 in the RR at 3).  However, du Pont had

presented this as a <u>single</u> claim:  Pennsylvania's unique statutory framework <u>and</u>

judicially-approved jury instructions, <u>coupled</u> with the admission of highly

prejudicial bad acts evidence, deprived him of his right to a fair trial and due

process of law.

The Magistrate Judge initially concludes, as did the Superior Court, that

Pennsylvania's insanity and GBMI statutory scheme sufficiently distinguishes

between the two verdicts, if not by the definitions themselves, then by the

instruction that the jury is to consider the verdicts in step-by-step fashion -- first

deciding whether a defendant is legally insane, and only if insanity is not proven,

then deciding whether the defendant is "guilty but mentally ill." (RR at 22-23; du Pont, 730 A.2d at 979-80.)[6]

However, given Pennsylvania's virtually synonymous definitions of insanity and GBMI, the pretense that the jury supposedly understood it was not to consider the GBMI verdict unless it first determined that du Pont did not prove insanity cannot withstand scrutiny. The jury was so instructed only after it first had been told that the difference between the two verdicts was that a legally insane defendant was "sick rather than bad," whereas a guilty but mentally ill defendant was "both bad and sick." (N.T. 3138.) Since there was no dispute that du Pont was "sick," the only question for the jury to resolve was whether he was "bad."

An instruction to the jury to base its verdict on whether or not it found du Pont to be a "bad" man, when combined with the barrage of inflammatory bad acts

[6]   The Magistrate Judge relied on Comm. v. Trill, 543 A.2d 1106 (Pa. Super. Ct. 1988), in which the court rejected a facial challenge to the constitutionality of Pennsylvania's insanity and GBMI statutory scheme. The Trill court, however, was not presented with a case where, as here, the "bad" versus "sick" jury instruction took on such enormous significance due to the introduction of a plethora of highly prejudicial bad acts evidence. More recently, the Pennsylvania Supreme Court decided a case where the defendant challenged the constitutionality of the same statutory scheme, but the Court limited its opinion to the issue of the burden of proof associated with the GBMI verdict. Comm. v. Rabold, 951 A.2d 329, 343 (Pa. 2008) ("The sole contest initiated by Appellant at trial to the jury charge was limited to his assertion that the burden in connection with a guilty-but-mentally-ill verdict must be assigned to the Commonwealth on proof beyond a reasonable doubt.").

17

evidence introduced against du Pont, violates due process. The Commonwealth

stressed the "bad acts" theme in its closing argument, encouraging the jury to

convict du Pont because he was a "bad" man. Referring to the evidence presented

by the defense, the prosecutor said, "did they really…show you…the underlying

characteristics of [du Pont as] a person?" (N.T. 3061.) According to the

prosecution:

> He was using drugs. He was throwing people off at gunpoint.
> He was throwing athletes off… When he wanted them off, they
> were gone, because he owned people where other persons
> collected horses.

(N.T. 3079-80.) The Commonwealth's closing also called attention to the 1987 hit

and run accident, describing it as yet another example of du Pont trying to get

away with a "bad act": "[Y]ou remember back in 1987 when he ran into

somebody?" (N.T. 3090.) The use of this bad acts evidence was simply a tawdry

attempt to poison the jury with completely irrelevant, prejudicial, and

inflammatory allegations, some of which were so stale they dated back more than

eight years before the shooting.

The Magistrate Judge recognized that the admission of such bad acts

evidence could rise to the level of a due process violation, but nevertheless adopted

wholesale the ruling of the Superior Court that the "bad acts" in this case were

relevant in one way or another to du Pont's mental state. (RR at 23-25.) The

"relevant" time period, according to the Superior Court, went as far back as 1987.

18

The expansive view of "relevance" in this case was unreasonable and itself violative of due process.  The notion that the prosecution in an insanity case is free to introduce any and all evidence of the defendant's behavior, regardless of its probative value to the <u>specific act</u> for which he is charged, and regardless of remoteness in time, is plainly incorrect.  Indeed, Pennsylvania courts have recognized that limitations exist on the admission of bad acts evidence.  <u>See</u> <u>Comm. v. Williams</u>, 160 A. 602, 605 (Pa. 1932) ("It is not to be supposed that under a plea of insanity every kind of evidence is to be admitted.  It should be evidence of circumstances calculated to cause or induce insanity…there must be limitations….").

As this Court recognized last year in <u>Albrecht</u>, constitutional limitations exist even on the admissibility of bad acts evidence directly related to the crime with which the defendant was charged.  485 F.3d at 128.  As the Court explained in the context of unreliable evidence generally, "[A] claim under the fundamental fairness standard would arise if the probative value of the evidence, although relevant, was greatly outweighed by the prejudice to the accused from its admission."  <u>Id.</u> at 122 n.6.[7]  It strains credulity to hold that du Pont's acts as far

---

[7]    The "bad acts" evidence admitted in <u>Albrecht</u> demonstrated that the defendant abused his wife seven months before his wife, daughter, and mother were killed in a fire that he was charged with deliberately setting, 485 F.3d at 128.  In <u>Albrecht</u>, unlike here, the evidence was plainly relevant

(continued...)

back as 1987 were probative of his mental state on January 26, 1996, when he shot

Schultz. Indeed, the Commonwealth's principal expert, Dr. O'Brien, conceded

that du Pont's acts in prior years had no bearing on whether he knew it was wrong

to shoot Schultz in 1996. (N.T. 2606.)

As for the evidence of drug use, it is clear from the record that this evidence

was introduced with the primary purpose of portraying du Pont as a "bad" man,

**not** because it was relevant to du Pont's mental condition. Despite the

Commonwealth's belated concession in its closing statement that drug use was not

relevant to du Pont's mental state at the time of the shooting (N.T. 3056-57), the

damage to du Pont's character was irreparable, and the bell could not be unrung.

Indeed, later in its closing statement, the Commonwealth referred to du Pont's drug

use as one of several examples of his bad character. (N.T. 3079.) This highly

prejudicial and irrelevant evidence of drug use surely played a role in the jury's

conclusion that du Pont was a "bad" man.

In rejecting what she viewed as du Pont's "bad acts" claim, the Magistrate

Judge also relied on a so-called "curative" instruction given by the trial court to the

jury regarding the bad acts evidence. That instruction, however, did nothing to

---

(...continued)

to the issue of motive, was directly related to the crime, and was limited to a short time period -- only seven months -- prior to the crime with which the defendant was charged.

20

ameliorate the substantial prejudice caused by the Commonwealth's extensive and inflammatory "bad acts" evidence. In its charge, the court merely told the jury that the "bad acts" evidence was admitted to provide "some background information that was used by the experts in their evaluations" and must not be regarded "as showing that the defendant is a person of bad character or criminal tendencies from which you might be inclined to infer guilt." (N.T. 3124.) With respect to the drug use evidence, the court instructed the jury that such evidence "[was] not to be considered by you as any evidence whatsoever of the defendant's guilt of the crime charged. It is only relevant, if at all, if you believe that it bears on the diagnosis of the defendant's mental condition at the time that he killed David Schultz." (N.T. 3125.)

These instructions are meaningless because they fail to explain how the "bad acts" evidence could be relevant to the experts' evaluation of du Pont or to his mental condition at the time of the shooting. Moreover, the danger with admitting such improper character evidence is that curative instructions cannot undo the harm. As this Court has just emphasized:

> Character evidence is not rejected because it is irrelevant. On the contrary, "it is said to weigh too much with the jury and to so overpersuade them as to prejudice one with a bad general record and deny him a fair opportunity to defend against a particular charge."

Morena, 2008 WL 4925051 at *4 (quoting Sampson, 980 F.2d at 86).  See also

Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir. 1976) (continued integrity of

proceedings is near impossible after admission of improper prejudicial evidence

because "[a] drop of ink cannot be removed from a glass of milk").

While the court told the jury that the "bad act" evidence was merely

"background information" (N.T. 3124), it later told that jury that the determination

of guilt or innocence by reason of insanity turned on whether or not he was "bad."

(N.T. 3138.)  Significantly, the Magistrate Judge did not seek to justify the "sick"

versus "bad" instruction at all, and instead downplayed its importance by noting

that it was not "the only guidance given to the jury."  (RR at 23.)  It was, however,

the only instruction that offered any meaningful explanation to the jury of the

difference between the two possible verdicts -- the difference being whether du

Pont was "bad" or not.

Since the jury was specifically instructed to determine whether du Pont was

"sick rather than bad" or "both bad and sick," it could not ignore the bad acts

evidence in making that critical determination.  In the words of Estelle v. McGuire,

502 U.S. 62, 74-75 (1991), there is more than "a 'reasonable likelihood' that the

jury would have concluded that this instruction, read in the context of other

instructions, authorized the use of propensity evidence pure and simple."  As this

Court held in Toto, 529 F.2d at 282, a curative instruction cannot remove the

prejudicial stain caused by the wrongful admission of "bad acts" evidence where "such a strong impression has been made upon the minds of the jury by illegal and improper testimony, that its subsequent withdrawal will not remove the effect caused by its admission. . ." See also Morena, 2008 WL 4925051 at *4 ("[T]he District Court's limiting instructions were inadequate to cure the prejudice...."). That is surely the case here, as the jury was explicitly instructed to determine whether or not du Pont was "bad."

· · · · ·

In sum, du Pont was denied his constitutional right to a fair trial on his defense of insanity by Pennsylvania's unique and flawed statutory scheme and jury instructions. Coupled with the voluminous bad acts evidence admitted against him, the result was that the jury found du Pont "guilty but mentally ill" **not** because he knew that shooting Schultz was wrong, but instead because it believed he was a "bad" man. The Magistrate Judge failed to recognize, let alone address, this core constitutional violation, and simply relied on the trial court and Superior Court rulings to sweep the deprivation of due process under the proverbial rug. This was error. A conviction based on a flagrant violation of the right to due process of law cannot be allowed to stand. A COA should be issued so that this important constitutional claim may be considered by this Court on the merits.

**B.    Claims of Ineffective Assistance of Counsel**

    1.    Counsel Were Ineffective in Failing to Present Good Character Evidence

du Pont suffered substantial prejudice when his defense counsel did not call character witnesses to testify to his good reputation in the community for law-abiding and peaceful behavior. Several witnesses were available to testify, including Reverend John Driscoll, former President of Villanova University; Colonel John Russell, U.S. Army retired; John Leonard, President of the American Swim Coaches Association; and John McMeekin, President of the Board of Trustees of Crozer-Chester Medical Center.

In Pennsylvania, character evidence alone is sufficient to raise a reasonable doubt of guilt. Comm. v. Scott, 436 A.2d 607, 611 n.1 (Pa. 1981); Comm. v. Morgan, 739 A.2d 1033, 1037-38 (Pa. 1999). Beyond this long-established import of good character evidence, given the jury's obligation to determine the insanity defense on the basis of whether du Pont had proved he was not a "bad" man, and given the Commonwealth's evidence of prior bad acts, the need for good character evidence could not have been stronger. The Superior Court and the Magistrate Judge recognized that the claim as to the performance prong of the ineffectiveness of counsel was established, but determined that there was no prejudice because (1) two of the four character witnesses came from outside of Pennsylvania, and (2) the "extensive and specific evidence of du Pont's 'bad'conduct" rendered any good

24

character testimony of no effect. <u>Comm. v. du Pont</u>, 860 A.2d 525, 536 (Pa. Super. Ct. 2004).

These courts ignored the fact that each of the character witnesses had frequent contacts with du Pont over a long period of time. And, if the courts meant to assert that the jury could reject such testimony because two of the witnesses were from out of state, it would be improperly attributing to the jury xenophobic attitudes. Indeed, the Magistrate Judge erred in even attempting to assess the weight or credibility of the character evidence without first hearing from the witnesses.

Further, since the ultimate decision for the jury was whether du Pont was "both bad and sick" or "sick rather than bad," it is surely incongruous to assert that evidence of bad character automatically trumps good character evidence. An instruction that this evidence alone can create a reasonable doubt would have been enormously helpful in this case in meeting the defense burden of proving insanity by a preponderance of the evidence. The jury was left with the impression that du Pont was of particularly bad character, with few, if any, redeeming qualities. In view of the central focus on whether or not du Pont was "bad," the evidentiary imbalance caused substantial prejudice.

2.    Counsel Were Ineffective in Not Requesting Limiting
Instructions Regarding Evidence of du Pont's Pre-Arrest
Silence and Requests to Consult with Counsel

The Commonwealth went to great lengths to introduce evidence of du Pont's

refusal to discuss the shooting (his "silence") and his numerous requests to speak

with his lawyer during the two-day standoff with the police that preceded his

arrest. The use of pre-arrest silence and requests for counsel constitute a violation

of the Fifth and Fourteenth Amendments. See, e.g., Ouska v. Cahill-Masching,

246 F.3d 1036, 1047 (7th Cir. 2001); Combs v. Coyle, 205 F.3d 269, 282-83 (6th

Cir. 2000); U.S. v. Burson, 952 F.2d 1196, 1201 (10th Cir. 1991); Coppola v.

Powell, 878 F.2d 1562, 1566-68 (1st Cir. 1989).[8]

The trial court recognized the significant prejudice that could result if the

jury considered the evidence for the wrong purpose, and specifically offered to

give limiting instructions on this evidence. For no good reason, trial counsel failed

to request such an instruction. The Commonwealth made these facts a centerpiece

of its case. In the opening statement, the prosecutor asserted that du Pont "sought

his lawyer, over one hundred times, either by name or by reference" during the

---

[8]    The Supreme Court has rejected any distinction between the use of post-
arrest silence to demonstrate a defendant's guilt and to overcome a
defendant's plea of insanity, Wainwright v. Greenfield, 474 U.S. 284 (1986),
and there is no basis for drawing any such distinction in the pre-arrest
context. See, e.g., Colorado v. Welsh, 58 P.3d 1065, 1071 (Colo. Ct. App.
2002), aff'd on other grounds, 80 P.3d 296 (Colo. 2003).

stand-off, and the prosecutor informed the jury that during the trial it would hear

the actual tapes of those demands. (N.T. 67.) Commonwealth experts relied

heavily on the tapes to prove that du Pont had a guilty conscience and knew what

he had done was wrong. (See, e.g., N.T. 2309-10.)

The prosecutor then used du Pont's pre-arrest silence to cinch his closing

argument:

> The telephone conversation tapes begin and the Defendant asks
> for, as you heard, his lawyer 106 times. And the fact that he's
> asking for his lawyer, does that reflect, well, does that reflect
> he's out of touch with reality? Or the fact that he wants a
> lawyer to deal with a problem he has and that he thinks his
> wealth, his influence, his power and his lawyer are going to do
> what they've done before. (N.T. 3090.)

The Magistrate Judge's ruling that this evidence was simply "cumulative" of

other evidence of "petitioner's actions in the time surrounding the shooting" (RR at

11), reflects a failure to properly understand the evidence at trial. The evidence

that du Pont retreated to his mansion, would not permit entry by the police, and

reloaded the gun, had nothing to do with evidence of silence and requests to speak

with a lawyer. They are distinct pieces of evidence; not cumulative. Further, the

other evidence regarding du Pont's actions was not "more damning" (as suggested

by the Superior Court, du Pont, 860 A.2d at 535) than an assertion of silence and

repeated requests to speak with a lawyer.

3. Counsel Were Ineffective for Not Properly Investigating du
Pont's Use of a Dangerous Prescription Drug as Necessary
Rebuttal to the Commonwealth's Argument that Cocaine
Caused du Pont's Mental Illness

Post-sentencing, du Pont's mental state showed remarkable improvement.

As a result, his counsel conducted further investigation into possible causes of his

previous psychotic condition. They soon discovered information, available pre-

trial, that at the time of the shooting, du Pont had been taking a number of

medications imported from Bulgaria, including the drug Scopolamine.

N-butyl scopolamine in therapeutic doses causes drowsiness, euphoria,

amnesia, fatigue and dreamless sleep. Where, as in the present case, it breaches

the blood-brain barrier, it may also produce excitement, restlessness,

hallucinations, and delirium. See GOODMAN AND GILMAN: THE

PHARMACOLOGICAL BASIS OF THERAPEUTICS 150 (9th ed., 1996). du Pont was not

informed of these serious side effects.

In preparation for trial, du Pont was interviewed by Drs. Resnick and Sadoff.

During the interview, du Pont informed the doctors and counsel that he had been

receiving medical treatment by doctors from Bulgaria since 1991 and that he had

recently received medications issued by Bulgarian doctors. Upon du Pont's arrest,

he was incarcerated at Delaware County Prison, where he made repeated requests

for "Bulgarian medication" for his headaches. For reasons that could only be

28

developed at an evidentiary hearing, du Pont's trial counsel did not pursue this issue.

N-butyl scopolamine ingestion would have provided powerful scientific evidence refuting the Commonwealth's position that du Pont suffered from a cocaine-induced psychosis. The evidence would have shown that a prescribed substance exacerbated du Pont's existing mental disease and that du Pont had no reason to suspect that these medications could cause a toxic psychosis.

Post-trial, Dr. Sadoff, one of the forensic psychiatrists who testified at trial in support of the insanity defense, re-evaluated du Pont. (See Affidavit of Robert L. Sadoff, M.D., a copy of which is attached hereto as Exhibit F.) Dr. Sadoff reported profound improvement in du Pont's mental health and he concluded, after reviewing information about the N-butyl scopolamine ingestion, that du Pont's conduct was the result of a toxic psychosis caused in part by N-butyl scopolamine ingestion. Id.

Similarly, Dr. Joseph DiGiacomo, Clinical Professor of Psychiatry at the University of Pennsylvania, concluded that the prescription medications that du Pont ingested had precipitated a toxic psychosis, caused or played a significant role in the shooting for which du Pont was on trial, and caused or contributed to his subsequent amnesia about the shooting. (See Affidavit of Dr. Joseph DiGiacomo,

M.D., a copy of which is attached hereto as Exhibit G.[9] <u>See also</u> Affidavit of Dr. Bernard S. Yudowitz, M.D. (diagnosis of toxic psychosis), a copy of which is attached hereto as Exhibit H.)

The Magistrate Judge, in a basic misunderstanding of the claim, denied a hearing on this issue and dismissed the claim of ineffectiveness of trial counsel, finding that involuntary intoxication was not an independent defense. <u>But du Pont does not assert that he was entitled to prove involuntary intoxication as a defense.</u> Rather, the claim is that evidence that du Pont was taking other drugs that could cause the same type of psychotic reaction as cocaine would have provided a strong counter-argument to the Commonwealth's false, but heavily emphasized, cocaine abuse theory.

The Magistrate Judge also ruled that since the defense experts did not follow up on the prescription drug use issue, counsel cannot be considered ineffective for not investigating this matter. But it was the failure of counsel to investigate the existing evidence of the drug use that prejudiced du Pont. Counsel cannot be considered to have made a proper strategic choice unless he or she has investigated

---

[9]    The diagnosis of an acute schizophrenic episode may be mistakenly made as a result of N-butyl scopolamine ingestion. Consequently, some patients have been admitted to psychiatric institutions for observation and treatment, when in fact, the behavior and mental symptoms are indicative of a toxic acute organic psychosis. (<u>See</u> GOODMAN AND GILMAN: THE PHARMACOLOGIC BASIS OF THERAPEUTICS.)

and considered all of the alternative defenses.  <u>See</u>, <u>e.g.</u>, <u>Wiggins</u>, 539 U.S. 510;

<u>Jacobs</u>, 395 F.3d 92; <u>Dugas v. Coplan</u>, 428 F.3d 317 (1st Cir. 2005) (failure to

investigate arson evidence).  In <u>Wiggins</u>, 539 U.S. 510, trial counsel had uncovered

reports and other documents that would have been helpful on mitigation.  While

counsel retained a psychologist in preparation of the sentencing hearing, counsel

failed to provide to the psychologist-expert the documentation that would have

supported expert testimony on mitigating factors.  Similarly here, it was not the

mental health experts' responsibility to investigate possible prescription drug use

by du Pont.  Counsel had that information and it is the failure of counsel to provide

the information to the experts that is at issue.  <u>See also</u>, <u>Comm. v. Zook</u>, 887 A.2d

1218 (Pa. 2005) (counsel is ineffective in a case where he had obtained

information concerning organic brain damage, but did not provide this information

to expert psychologists).

> 4.    The State Courts Violated du Pont's Right to Counsel by
> Permitting the Psychiatrist/Lawyer Dr. O'Brien to Testify
> as an Expert Witness

In 1990, Taras Wochok, Esquire, acting as du Pont's lawyer, and concerned

with du Pont's health and the consequences of his reported behavior, consulted

with Dr. Rudolf Laveran-Stieber, M.D., a psychiatrist associated with the Institute

of Pennsylvania Hospital.  On November 20, 1992, Dr. Laveran-Stieber suggested

that he and Wochok meet with Dr. Howard Sudak, M.D.  In turn, Dr. Sudak

31

suggested that a forensic psychiatrist be included in the consultation, and Dr.

O'Brien was invited to participate. At a consultation that took place on December

22, 1992, the participants discussed what legal and medical steps should be taken

to provide du Pont with appropriate care and treatment. Dr. O'Brien was consulted

as "an expert in forensic psychiatry." (See Affidavit of Taras M. Wochok, Esquire

at ¶¶ 16-19, a copy of which is attached hereto as Exhibit I.) Dr. O'Brien billed

Wochok $500.00 for his consultation. In the cover letter accompanying his bill,

after expressing his hope that the consultation had been useful, Dr. O'Brien offered

his future assistance "in this or other cases."

The state courts made an unreasonable determination of law in rejecting the

Sixth Amendment claim. A communication between an attorney and his client that

is protected by the common law attorney-client privilege is also protected from

government intrusion by the Sixth Amendment. See Weatherford v. Bursey, 429

U.S. 545, 552 (1977); U.S. v. Blasco, 702 F.2d 1315, 1329 (11th Cir. 1983). The

Superior Court determined that du Pont was never a "client or patient of Dr.

O'Brien," du Pont, 730 A.2d at 976, that "no…confidential attorney-client

communications were divulged in the December 1992 meeting," id. at 977, and

that Dr. O'Brien did not "receive[], retain[] or use[] any information from the

conference." Id. This is a clearly erroneous application of attorney-client

principles and, without a full evidentiary hearing, such findings are unreasonable

under § 2254(d)(2). <u>See</u>, <u>e.g.</u>, <u>Taylor v. Maddox</u>, 366 F.3d 992, 1000-01 (9th Cir. 2004).

Mr. Wochok consulted three psychiatrists (including Dr. O'Brien) because, as du Pont's attorney, he had legal concerns about whether du Pont could be involuntarily committed. He needed professional medical advice to determine what legal advice he should render to his client. As an attorney representing a client suffering from a disability, he had an ethical responsibility "to seek guidance from an appropriate diagnostician." Pa. Rules of Professional Conduct, Rule 1.14, cmt.[10] The state court fact findings on this issue were "unreasonable" under § 2254(d)(2). Further, since the issue was decided by the state courts without an evidentiary hearing, a hearing should have been held by the District Court to permit du Pont to rebut any "presumption of correctness" afforded by § 2254(e)(1).

---

[10]    The trial court's ruling that the record failed to establish that DR. O'Brien received, retained, or used any information from the December 1992 conference was made without a hearing. While O'Brien might have considered possible drug use in formulating his opinion, even had the 1992 meeting not occurred, there is a substantial question whether he would have reached the same conclusion as he did without having attended the 1992 meeting. This issue cannot be decided without a hearing.

33

**C.    du Pont Was Deprived of Due Process of Law and His Right to Confrontation as a Result of the Commonwealth's Presentation of False Evidence and the Suppression of Exculpatory Evidence**

The constitutional violation in the improper introduction of prior bad act evidence was compounded by the Commonwealth's "proof" that du Pont was a long term abuser of cocaine and that his shooting of Schultz was the product of a cocaine-induced psychosis.  To this end, the Commonwealth used false testimony to prove not only what was not relevant, but what was not true.

In an attempt to explain why du Pont continued to be delusional in jail if cocaine was the causal agent, the prosecution asked defense expert, Dr. Sadoff:

> Q.    ... you can not be certain that the Defendant did not obtain and use controlled substances in prison, can you?
>
> A.    In the prison?
>
> Q.    Right.
>
> A.    I would be very surprised if he did.
>
> Q.    Did you know that the Defendant approved five cash transactions of $7,500.00 each to Paul McCarthy in hand-to-hand cash transactions in 1996 while he was in prison?
>
> A.    I didn't know that.

(N.T.1821-1822.)

Upon defense counsel's objection to this baseless and prejudicial question, the prosecutor promised to "tie it up."  The trial court responded, "**You better.**" (N.T. at 1822) (emphasis added), and then stated:

34

> I think you're a long way from being able to represent that this
> testimony is going to come in. And if it doesn't there is going
> to be a **huge problem.**

(N.T. 1823-1824 (emphasis added).)

The Commonwealth attempted to save its case by the false testimony of

Robert Calabrese, who testified that during the summer of 1988, he witnessed du

Pont ingest cocaine on one occasion. (N.T. 1990-1991.) Post-trial, it was

discovered that the Commonwealth had failed to disclose that Calabrese had

repeatedly denied to the prosecutors and their expert witnesses that he had ever

seen du Pont use cocaine. (See Affidavit of Robert Calabrese, a copy of which is

attached hereto as Exhibit J.)[11]

Calabrese's repeated denials that he had ever witnessed du Pont ingest

cocaine – denials he had made to the prosecutors and the Commonwealth's expert

witness – were Brady material. Since Calabrese was the only witness who

provided first-hand testimony of cocaine use, there is a reasonable probability that,

had the evidence been disclosed to the defense, the verdict would have been

---

[11]     The Commonwealth continued its course of misconduct with the
presentation of the expert testimony of Dr. O'Brien. Dr. O'Brien (who is also a
lawyer) was instructed not to refer to any alleged cocaine use evidence other than
that already presented by witnesses at trial. (N.T. 2190-91.) Yet, Dr. O'Brien
volunteered that du Pont may have been using drugs while in jail, as he had been
visited "by the person who was supplying him." (N.T. 2407.) The trial court
recognized that this testimony was grossly improper and "gratuitous" (N.T. 2409),
but denied a motion for mistrial.

different. Calabrese's denials would have undermined not just the credibility of this significant witness, but the credibility of the Commonwealth's entire case, and of the prosecutors themselves.

The Magistrate Judge found no prejudice based on the supposition that the defense had initiated discussion of drug use and that the Commonwealth had produced other evidence on this issue. However, the Commonwealth made it clear from the start of the trial that it would defend against the insanity plea by presenting evidence of cocaine-induced psychosis. Accordingly, du Pont's expert witnesses properly anticipated this testimony in stating that they had ruled out possible cocaine use as a factor in du Pont's mental disease. Moreover, Calabrese provided the only direct evidence of cocaine use.

### D.    The Magistrate Judge Ignored Controlling Law on the Standard for Prejudice

Beyond the right to relief if any single claim is deemed meritorious, du Pont must be given relief if the cumulative prejudice from the claims establishes the requisite degree of prejudice. The Magistrate Judge failed to engage in the cumulative harm and prejudice analysis. Moreover, since the state courts also failed to engage in this required analysis, review on this issue is de novo. As the Sixth Circuit has held:

> The state appellate court rejected . . . [the] petition for post-conviction relief because it found that no single item of withheld evidence was material . . . Because the state court

36

> applied only an item-by-item determination of materiality, the
> decision is contrary to the Supreme Court's decision in <u>Kyles</u>
> [where] [t]he Court . . . specified that the materiality of
> withheld evidence may be determined only by evaluating the
> evidence collectively.

<u>Castleberry v. Brigano</u>, 349 F.3d 286, 291 (6th Cir. 2003).

It is difficult to envision a case in which cumulative prejudice analysis is as appropriate as it is with respect to du Pont's claims. ***Every constitutional claim relates to the insanity defense presented to the jury and, when viewed collectively in terms of prejudice, these claims undermine any confidence in the outcome of the trial.*** Indeed, the cumulative prejudice in this trial, like that in the infamous trial of Sam Sheppard, "rubbed luster from American jurisprudence." PAUL HOLMES, THE SHEPPARD MURDER CASE (1961).

On the evidence presented at trial related to the defense of insanity, there was an extremely close issue for the jury. The defense presented several eminent psychiatrists who concluded that du Pont suffered from paranoid schizophrenia and that, as a result of this disease, he did not know that his shooting of Schultz was wrong. The defense also presented compelling evidence that du Pont suffered from this disease over a long period of time, that he was delusional and paranoid in the extreme, and that he had degenerated in the period just before the shooting.

The jury deliberated for over seven days, a fact that itself demonstrates the closeness of the case.  See, e.g., Dugas, 428 F.3d at 335-336.  It also rejected the prosecution's first-degree murder theory.  The jury decided that du Pont did suffer from a mental disease, and as a result could not "appreciate" the wrongfulness of his acts, a finding that would establish insanity under the ALI test, but here resulted in GBMI.  The distinction between "appreciating" the wrongfulness of one's acts as opposed to "knowing" the acts were wrongful is highly elusive. There can be no denying that the legal and factual issues that the jury had to decide in this case were strongly contested, with substantial evidence supporting the defense.

## V. CONCLUSION

For all of the above stated reasons, du Pont respectfully submits that the

Application for the Certificate of Appealability should be granted.

Respectfully submitted,

Burt M. Rublin (I.D. No. 32444)
Diana L. Spagnuolo (I.D. 92227)
BALLARD SPAHR ANDREWS
& INGERSOLL, LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
(215) 665-8500

David Rudovsky (I.D. No. 15168)
KAIRYS, RUDOVSKY,
MESSING & FEINBERG, LLP
718 Arch Street
Suite 501 South
Philadelphia, PA 19106
(215) 925-4400

Counsel for Appellant

Dated: November 24, 2008

39

## CERTIFICATE OF SERVICE

I, Diana L. Spagnuolo, do hereby certify that on this date I caused a true and correct copy of the foregoing Unopposed Motion of Appellant John E. du Pont to File an Application in Excess of the Limitations Set Forth in Federal Rule of Appellate Procedure 27 to be served as follows:

**Via Federal Express**

William R. Toal, III, Esquire
Delaware County Courthouse
201 West Front Street
Media, PA  19063


Diana L. Spagnuolo